Filed 7/22/22  P. v. Broussard CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br>CARLTON BROUSSARD,<br><br>        Defendant and Appellant. | A161139<br><br>(Alameda County Super. Ct. No. 177907A) |

A jury convicted defendant Carlton Broussard of two counts of first degree murder and other offenses.  On appeal, defendant contends the jury was incorrectly instructed on self-defense because the instruction stated that defendant "must have acted *only* because of" his belief that he was in imminent danger of death or great bodily injury.  (Italics added.)  We reject this contention and find no prejudice in any event.  Defendant also raises claims of sentencing error.  As to his challenge to the imposition of fines and fees based on inability to pay, we conclude this issue is forfeited.  But defendant's claims of unauthorized sentences have merit, as the Attorney General concedes.  Accordingly, we vacate the sentence because the 25-year-to-life terms for counts 1 and 2 are unauthorized and we remand for resentencing.  On remand, the trial court is instructed to recalculate defendant's presentence custody credit.  In all other respects, the judgment is affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

By amended information, the Alameda County District Attorney charged defendant with the murder of Marcus Sims (Pen. Code,[1] § 187, subd. (a); count 1), the murder of Donald Ray Ward, Jr., (*ibid.*; count 2), possession of a firearm by a felon (§ 29800, subd. (a)(1); count 3), and second degree robbery (§ 211; count 4). The murders were alleged to have occurred on January 20, 2015. The robbery was alleged to have occurred five days later, and codefendant Damontae Dupree Warfield was also charged with robbery. (There were no codefendants for the murder charges.) Various enhancements were alleged for counts 1 and 2, including that defendant personally discharged a firearm causing great bodily injury and death (§ 12022.53, subd. (d)), and the special circumstance of more than one murder was alleged (§ 190.2, subd. (a)(3)).

A jury trial began in January 2020. The jury found defendant guilty of all charges, finding defendant guilty of first degree murder in counts 1 and 2, and found all enhancement and special allegations true.

*Prosecution's Case*

<u>January 20, 2015, murders</u>

In January 2015, Dakila Grayson was in a dating relationship with defendant. She knew Donald Ward (one of the murder victims) because they had gone to high school together. Grayson heard that Ward and another man were committing robberies. Defendant told her that Ward had asked for

---

[1] Further undesignated statutory references are to the Penal Code.

defendant's permission to rob an "old man" and defendant had instructed Ward not to do it.[2]  Grayson later heard that Ward robbed the man anyway.

On January 20, Grayson was visiting her grandmother, who lived in the Campbell Village housing complex in West Oakland.[3]  Grayson met with defendant, who was outside on 10th Street.  He had borrowed her phone and returned it to her.  Grayson was walking on 10th Street toward Willow Street to go back to her grandmother's place with her phone when she saw a van coming toward her.  The van stopped in the middle of the block because defendant was standing in the street.  Defendant had a gun in his hand.

Grayson was a reluctant trial witness and testified that she "d[idn]'t really remember" what happened next but "within seconds [she] heard gunshots and [she] turned and ran into [her] grandmother's house."  Grayson acknowledged, however, that she previously told the police that defendant made the men in the van get out and told them to lie on the ground and then shots were fired.  She heard defendant say, "Get out of the car."  Grayson viewed the scene from the passenger side of the van.  She thought defendant was standing on the driver's side, and she could see the victims lying on the pavement from under the van.  Grayson indicated that defendant's gun was about two-and-a-half feet long.  She did not see defendant shoot the gun.

In cross-examination, Grayson testified that before the shooting, defendant told her that his cousin Tony was trying to have him killed.

Michael Garcia was familiar with the Campbell Village neighborhood and lived there 13 years.  He knew Marcus Sims (the other murder victim),

---

[2] As will be seen, the "old man" was Tom, an older man in the neighborhood defendant had known all his life; defendant thought of Tom as like family.

[3] Dates discussed at trial occurred in 2015.

though not well; he knew Ward as "[j]ust a neighborhood kid"; and he knew defendant "[p]retty good" and they had hung out a few times.

Garcia testified that, on January 20 just before 5:00 p.m., he was in his apartment with his girlfriend when he heard a single shot. He opened his front door and saw two vehicles on the street, a brown van pointed one way and a small blue or gray car pointed the opposite way. Defendant was in the street with an assault rifle. Defendant was "discharging [the rifle] towards the driver's side of the van." Garcia testified that he saw another person standing on the sidewalk who was wearing a ski mask and holding a handgun. He did not see that person fire his weapon.

Garcia observed defendant shooting at Ward, who was "[t]rying to scamper to the back of the van." Garcia also saw Sims, who was "already down trying to scamper underneath the van." Defendant walked toward the driver's door and pointed the assault rifle down to the ground; he said, "You fucking little bitch," and shot at Sims three or four times. Defendant then walked over to the small blue car, threw the rifle in the backseat, and got in the passenger's seat, and the car drove away.

In cross-examination, Garcia admitted that he was arrested about two months after the shooting for possession of methamphetamine, that he sometimes sold methamphetamine, and that he had been a drug user for over 20 years.

When police arrived at the crime scene, Sims was on the ground near the van. Ward was found lying on his back in the trunk area of the van. Autopsies showed the victims sustained multiple gunshot wounds. Ward had five entry wounds and five exit wounds, and Sims had four entry wounds and three exit wounds. They had both been shot in the back. One of Ward's entry

4

wounds was at the left lower back, and Sims had entry wounds at the right upper back, right lower back, and back of the left thigh.

Investigation and Arrest

On January 20, Robert Rosin was a sergeant in the homicide section of the Oakland Police Department. Rosin testified that he went to the scene of the killings around 6:30 p.m. that evening. He observed a gold Dodge Caravan with the driver's window shattered and saw multiple expended rifle casings, including two inside the van. Altogether, six expended rifle casings, one .40 caliber pistol casing, and many bullet fragments were found at the scene.

On March 18, Rosin spoke with Garcia, who was under arrest for narcotics charges and a charge related to possession of a firearm. Garcia was visibly upset during the interview. Garcia said he was upset because the victims and the suspects were his friends and because he feared retaliation for cooperating with the police. Garcia told Rosin he saw defendant holding an assault rifle and he saw a second person who was wearing a mask. Garcia said he saw defendant shoot Sims in the back.

As part of his investigation, Rosin obtained authorization to wiretap certain phones, and recordings of defendant's telephone conversations were played for the jury. In one recording, defendant said to an unknown man that he "call[ed] the shot" and he wanted a potential witness "gone."[4]

---

[4] According to the transcript of the recording played for the jury, defendant said to the unknown man, "N***a I ain't tryin' to hear none of that. I want her gone. I call the – call the shot. The shot supposed to be done the way I called it. Pure point blank. You feel me? I ain't tryin' to hear what nobody else said. N***a asked me what I wanted to be done, and I told them that's supposed to be done. That's why I'm trippin'. . . . Ain't nobody doin' it."

Rosin obtained a warrant for defendant's arrest. From his investigation including analysis of cell phone information, Rosin knew defendant was in Florida. When defendant was taken into custody in Florida, he initially identified himself as "Tyrell Love."

Rosin interrogated defendant on March 21. Defendant said he played football with Sims and Ward and never mentioned that he was afraid of them. Defendant first denied being at the scene of the shooting, then he said he was a witness, and eventually he admitted he was a perpetrator. Defendant told Rosin he used a pistol and later admitted he had the assault rifle. Defendant also admitted he robbed the Brentwood Smoke Shop a few days after the killings.

<u>Gang Evidence</u>

An Oakland police officer testified as an expert in the investigation of gang-related crimes involving criminal street gangs in the city of Oakland. He testified that Campbell Village Gang is a criminal street gang that claims the Campbell Village housing project and surrounding areas as its turf. In his opinion, Warfield (defendant's codefendant in the robbery charge), Sims, and Ward were members of Campbell Village Gang. Photographs of defendant with Campbell Village Gang members showed defendant making gang hand signals. Defendant also had a tattoo on his forearm with the nickname of a Campbell Village Gang member who had been murdered by Acorn, a rival gang.

Asked in cross-examination about his statement, defendant testified that he did not intend to have a witness killed, rather he wanted her to get out of California because the families of the victims had threatened her.

6

*Defense*

Minger Dorsey testified he was driving in the Campbell Village area and noticed a girl standing at the intersection of 10th and Willow Streets. She was looking down the street with "a weird look on her face," and then gunshots started going off. In a statement to the police taken on the day of the shooting, Dorsey described seeing a Black man, five foot, seven inches tall, about 140 pounds with an assault rifle, but at trial he could not give a description of the man with the rifle.[5] Dorsey saw a van. The man with the assault rifle shot a man who was on the ground. Dorsey saw another man approach the van; this man "shot the guy on the ground again with a handgun." Dorsey testified the man with the assault rifle stood over the victim and appeared to shoot "[i]nto the body." It looked like the man with the handgun also shot the victim on the ground. Then the two men jumped in a car that was parked off to the side, and they left.

Defendant testified on his own behalf. He was 34 years old at the time of trial. In 2015, he lived part time in Campbell Village between 10th and Eighth Streets. He has a tattoo that says, "Campbell Village," and another that says, "Long Live Wild Boodie."[6]

Defendant had known Sims for about 12 years, they hung out a lot, and he would see Sims every day. Defendant also knew Ward, who was much younger. Ward lived in the neighborhood and was in the "same crowd, but he was just a younger generation." Sims often had a handgun with him, and Ward also had a gun.

---

[5] In closing argument, defense counsel noted that Dorsey described a shooter who was "shorter and lighter than" defendant.

[6] Defendant testified that Boodie was the nickname of a friend who had been like a brother to him and that Boodie had been shot by an Acorn gang member.

7

Defendant had problems with his cousin, "Little Tony." Defendant knew that Sims and Ward were committing robberies. Asked how they started committing so many robberies, defendant testified, "[W]hen my cousin [Little Tony] came home, I guess he took them under his wing and gave them the go ahead to do whatever they wanted to do." Little Tony "told them that they ain't got to listen to anybody but him and got to answer to nobody but him."

Defendant testified that he had a close relationship with Tom, an elderly man from the neighborhood whom defendant had known his entire life. Tom "was like a good parent" and "like a grandpa." Defendant was aware that Sims and Ward robbed Tom more than once. Defendant saw Tom in the hospital in January after he had been robbed. Defendant talked to Little Tony about his displeasure that Tom had been robbed.

Defendant testified that he heard Little Tony "had [$]20,000 on my head." He understood that Sims, Ward, and others had been "hired to do something to" defendant. He was "scared" and "upset," because, he testified, "I knew if they had an opportunity they was going to kill me." A friend gave defendant a handgun about a week-and-a-half before the shooting. Defendant was scared and "had to stay away from the situation," so he did not go outside for a few days and stayed with his girlfriend Grayson in East Oakland. Defendant testified he was still scared when he "came out in the community" again.

On the day of the shooting, defendant went to Campbell Village around 2:00 p.m. and hung out on 10th Street between Willow and Campbell. He got a ride there from Dominique, who had a blue four-door car. Defendant was outside for a few hours with about 20 people, a mix of men and women. Defendant was smoking weed and had Codeine syrup and powder cocaine.

8

Michael Garcia was there for a while; they "were all there smoking and drinking, you know, having another day kickin' it." (According to defendant, Garcia went home about an hour before the shooting.)

Defendant had his nine-millimeter handgun with him. He saw other people with guns, including "big guns." Defendant testified that a friend known as "Saucey Willow" had an assault rifle.

A little after 5:00 p.m., Sims and Ward pulled up in a Dodge Caravan. At first defendant was not concerned. He testified, "I really wasn't trippin' off of them because I was outside with my family and friends." Then one of the men in the van said, "Motherfucker n***a mind their own business." Defendant understood they were referring to the robbery of Tom. Defendant started "exchanging words" with Sims and Ward. One of them said, "If Motherfucker ain't mind their own business, they gonna end up on a T-shirt." Defendant explained that "end up on a T-shirt" meant killed because family and friends of a murder victim would commemorate the victim with a memorial t-shirt.

Defendant walked toward the van. Defense counsel asked if he was scared at that point. He responded, "I was, but it was one of them situations where, you know, I was tired of running and stuff like that. So, you know, it's here or there or now. It's like, you know, I've been trying to dodge this situation for so long it's like, you know."

Defendant testified, "I approached the vehicle, and by the time I got to the driver's side, the door came open and from my knowledge I seen a little flash, like silver, off the thing and as" Sims "got out [of] the car, I pulled out and I shot him." Defense counsel asked whether he saw a gun on Sims. Defendant answered, "I don't think so. I got the flashing, light. I thought it was the hammer because . . . when you got a little hammer like the chrome

9

off the reflection, so I'm knowing he used to carry one. So my instincts already kicked in that he had a hammer on him, and I just shot him."[7] It happened fast. Defendant denied shooting Ward.

Defendant testified he had seen people get shot and killed four or five times in the Campbell Village area and this contributed to his fear. He testified that he thought Sims was going to kill him, and he shot Sims because he feared for his life. Defendant denied shooting Sims while Sims was on the ground; he said he shot him while he was standing up.

After shooting Sims, defendant started to walk away, and he heard more gunshots. Defendant testified he turned around and saw his friend Saucey. He heard one shot.

Defendant and Saucey got into Dominique's blue car, and she drove them away from the scene. In the car, Saucey told defendant that he had shot Sims and Ward. Defendant testified it "wasn't my motive to even kill anybody even though I heard the threat." He gave Saucey his gun to get rid of.

Defendant admitted that he and his cousin committed the charged robbery a few days later. At the end of January, he left California by train and ended up in Florida. Defendant testified he left because of "a bunch of rumors going on and my baby mama got shot at, so I wasn't trying to get any more people involved . . . ."

In cross-examination, defendant acknowledged that the Campbell Village area was violent and that Campbell Village (the gang) was "beefing" with rival gang Acorn when his friend Boodie was killed by Acorn. Defendant

---

[7] In cross-examination, defendant testified that when Sims "came out [of] the van and his shirt pulled, I thought that was a gun because it glanced off the light, and I pulled up and shot."

10

denied that he and Little Tony were fighting over control of the Campbell Village gang. Defendant testified that his disagreement with Tony was not about who should be the leader of the gang, "It was over people that didn't take care of [Tony] while he was in jail." Defendant testified that Ward and Sims let him know they were planning to rob Tom, and he told them, "no, that's family." When they robbed him anyway, defendant was angry, but he testified, "I didn't take no actions on it."

*Closing Arguments and Jury Verdict*

The prosecutor argued defendant was "in a beef over territory" and killed the victims because they defied him. He told the jury there were nine shots and two shooters, defendant was one of the perpetrators, and he aided and abetted the second person in committing the murders. The prosecutor argued the mode of attack, the multiple shots in the back, and the positions of the victims showed what defendant was thinking, and he was guilty of two first degree murders.

The defense theory was that defendant fired only one shot at Sims with a handgun, and someone else with an assault rifle later fired a volley of shots killing Ward (and hitting Sims, too). Defense counsel urged that what defendant did was "not a crime, because he thought his life was threatened and he described . . . the behavior of Mr. Sims when he opened the door and he saw there was a gun and he then fired. " He argued, "shooting once in a situation like this where [defendant] found he was going to be killed . . . is no more force than was reasonably necessary."

11

## DISCUSSION

### A. *Jury Instruction on Self-Defense*

#### 1. Instruction Given

The trial court instructed the jury with CALCRIM No. 505 on justifiable homicide—self-defense as follows: "The defendant is not guilty of murder if he was justified in killing someone in self-defense. The defendant acted in lawful self-defense if:

"1. The defendant reasonably believed that he was in imminent danger of being killed or suffering great bodily injury.

"2. The defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger. [¶] AND

"3. The defendant used no more force than was reasonably necessary to defend against that danger.

"Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed there was imminent danger of death or great bodily injury to himself. Defendant's belief must have been reasonable *and he must have acted only because of that belief*. The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, the killing was not justified."[8]  (Italics added.)

---

[8] The instruction continued: "When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant[']s beliefs were reasonable, the danger does not need to have actually existed.

12

## 2. Preservation of Claim

Defendant contends the language of the instruction that "he must have acted *only* because of that belief" was erroneous. (Italics added.) He argues the law of self-defense requires a defendant not act in a spirit of revenge, but there is no requirement that the defendant act *only* because of fear. Defense counsel did not raise this claim at trial, and defendant argues that if his appellate claim is forfeited, then he received ineffective assistance of counsel.

"[A] trial court in a criminal case is required—with or without a request—to give correct jury instructions on the general principles of law relevant to issues raised by the evidence." (*People v. Mutuma* (2006) 144 Cal.App.4th 635, 640.) We will consider defendant's claim of instructional

---

"The defendant['s] belief that he was threatened may be reasonable even if he relied on information that was not true. However, the defendant must actually and reasonably have believed that the information was true.

"If you find that Marcus Sims and Donald Ward threatened or harmed the defendant or others in the past, you may consider that information in deciding whether the defendant['s] conduct and beliefs were reasonable.

"If you find that the defendant knew that Marcus Sims and Donald Ward had threatened or harmed others in the past, you may consider that information in deciding whether the defendant['s] conduct and beliefs were reasonable.

"Someone who has been threatened or harmed by a person in the past is justified in acting more quickly or taking greater self-defense measures against that person.

"If you find that the defendant received a threat from someone else that he reasonably associated with Marcus Sims and Donald Ward, you may consider that threat in deciding whether the defendant was justified in acting in self-defense.

"The People have the burden of proving beyond a reasonable doubt that the killing was not justified. If the People have not met this burden, you must find the defendant not guilty of murder."

error despite his failure to raise the issue at trial. (See *People v. Palmer* (2005) 133 Cal.App.4th 1141, 1156 ["a defendant need not object to preserve a challenge to an instruction that incorrectly states the law and affects his or her substantial rights].)

3.    Analysis

The instruction given in this case, a version of CALCRIM No. 505, is based on section 198, which provides, "A bare fear of the commission of any of the offenses mentioned in subdivisions 2 and 3 of Section 197, to prevent which homicide may be lawfully committed, is not sufficient to justify it. But the circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted *under the influence of such fears alone.*" (Italics added.)[9]

As defendant acknowledges, challenges like his to self-defense instructions are regularly made and rejected. In *People v. Shade* (1986) 185 Cal.App.3d 711 (*Shade*), for example, the jury was instructed with CALJIC No. 5.12 that "a killing is justified (1) if the circumstances are sufficient to excite the fears of a reasonable person that there is imminent danger of death

---

[9] Section 197, subdivisions (2) and (3), in turn, provide that homicide is justifiable "(2) When committed in defense of habitation, property, or person, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony, or against one who manifestly intends and endeavors, in a violent, riotous, or tumultuous manner, to enter the habitation of another for the purpose of offering violence to any person therein" and "(3) When committed in the lawful defense of such person, or of a spouse, parent, child, master, mistress, or servant of such person, when there is reasonable ground to apprehend a design to commit a felony or to do some great bodily injury, and imminent danger of such design being accomplished; but such person, or the person in whose behalf the defense was made, if he or she was the assailant or engaged in mutual combat, must really and in good faith have endeavored to decline any further struggle before the homicide was committed."

14

or great bodily injury, and (2) *the party killing acted under the influence of such fears alone.*" (*Id.* at p. 716, italics added.)  The defendant argued the instruction was incorrect "because it tells the jury self-defense is not available when a person does not act out of fear alone, but out of fear and a desire to harm the attacker."  The Court of Appeal rejected the defendant's argument as meritless because "Penal Code section 198 specifically states 'the circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted *under the influence of such fears alone.*' " (*Ibid.*)

In *People v. Trevino* (1988) 200 Cal.App.3d 874, 877 (*Trevino*) the defendant similarly challenged CALJIC No. 5.12.  He argued there was evidence in his case "from which the jury could have concluded that he acted both out of a reasonable fear, and also out of ill will toward [the victim].  He argue[d] that where the danger is real, not imagined, and imminent, not inchoate, his actions need not be motivated by fear alone. . . . He contend[ed] that there was evidence from which the jury could have found that the danger was real and not merely apparent or inchoate and that his fear was reasonable, yet could have determined that [he] did not act under the influence of fear alone." (*Id.* at p. 877.)

The Court of Appeal rejected the argument.  "We find the law to be settled that '[t]o be exculpated on a theory of self-defense one must have an honest *and* reasonable belief in the need to defend.  [Citations.]  A bare fear is not enough; "the circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted under the influence of such fears alone." (Pen. Code, § 198.)' [Citations.]  Hence, an instruction which states that the party killing must act under the influence of such fears

15

alone, is a correct statement of the law." (*Trevino*, *supra*, 200 Cal.App.3d at pp. 878–879.)

The *Trevino* court went on to explain: "[W]e do not mean to imply that a person who feels anger or even hatred toward the person killed, may never justifiably use deadly force in self-defense. . . . [¶] . . . [I]t would be unreasonable to require an absence of any feeling other than fear, before the homicide could be considered justifiable. Such a requirement is not a part of the law, nor is it a part of CALJIC No. 5.12. Instead, the law requires that the party killing *act* out of fear alone. . . . The party killing is not precluded from feeling anger or other emotions save and except fear; however, those other emotions cannot be causal factors in his decision to use deadly force. If they are, the homicide cannot be justified on a theory of self-defense. But if the only causation of the killing was the reasonable fear that there was imminent danger of death or great bodily injury, then the use of deadly force in self-defense is proper, regardless of what other emotions the party who kills may have been feeling, but not acting upon." (*Trevino*, *supra*, 200 Cal.App.3d at p. 879.)

Our Supreme Court quoted *Trevino* with approval in *People v. Nguyen* (2015) 61 Cal.4th 1015 (*Nguyen*). There, the defendant shot and killed a rival gang member who, carrying a gun, approached the car the defendant was driving. (*Id.* at p. 1043.) The defendant contended that the evidence established self-defense as a matter of law. (*Id.* at p. 1042.) In rejecting the defendant's claim, the court observed: "*Trevino* clarified that this rule [referring to section 198's requirement that a defendant act on 'such fears alone'] does not 'imply that a person who feels anger or even hatred toward the person killed, may never justifiably use deadly force in self-defense.' . . . 'The party killing is not precluded from feeling anger or other emotions save

16

and except fear; however, those other emotions cannot be causal factors in his decision to use deadly force. If they are, the homicide cannot be justified on a theory of self-defense. . . .' " (*Id*. at p. 1045.)

Defendant argues we should not rely on cases such as *Nguyen, Trevino,* and *Shade* because they do not address his specific claim, which is that section 198 does not mean what it says. His position is that, when section 198 was enacted in 1872, the Legislature did not intend the language "the party killing must have acted under the influence of such fears alone" to mean that justifiable homicide requires the killer to have acted under the influence of fear alone. Rather, defendant posits, the Legislature intended the language to mean that a killing is justified so long as the killer "really acted under the influence of those fears, and not in a spirit of revenge" (quoting Stats. 1850, ch. 99, § 30, p. 232). He further argues, "aside from the pursuit-for-revenge scenario, the law require[s] no purity of motive."

We are not persuaded by defendant's argument based on legislative intent. "When interpreting a statute our primary task is to determine the Legislature's intent. [Citation.] In doing so we turn first to the statutory language, since the words the Legislature chose are the best indicators of its intent." (*Freedom Newspapers, Inc. v. Orange County Employees Retirement System* (1993) 6 Cal.4th 821, 826.) " 'If the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature (in the case of a statute) . . . .' " (*Delaney v. Superior Court* (1990) 50 Cal.3d 785, 798.)

Here, the language of section 198 that "the party killing must have acted under the influence of such fears alone" is sufficiently clear that we need not resort to indicia of the Legislature's intent in 1872. We agree with *Trevino*'s interpretation of the law of self-defense. A person who kills may

17

feel anger, hatred, jealousy, or other emotion toward the victim, but "those other emotions *cannot be causal factors* in [the] decision to use deadly force. If they are, the homicide cannot be justified on a theory of self-defense." (*Trevino, supra*, 200 Cal.App.3d at p. 879, italics added.) We therefore find no error in the instruction on self-defense given in this case.

    4.    <u>Prejudice</u>

Even assuming error in the instruction, we find the error harmless beyond a reasonable doubt. (See *People v. Brooks* (2017) 3 Cal.5th 1, 69–70 [reviewing error in misdescription of an element of an offense under *Chapman v. California* (1967) 386 U.S. 18, 24].)

We agree with the Attorney General that if, instead of being told, "Defendant's belief must have been reasonable and he must have acted only because of that belief," the jury had been instructed, "Defendant's belief must have been reasonable and he must have *really acted under the influence of those fears, and not in a spirit of revenge*," the result would have been the same. The only evidence of motive other than fear presented in this case was revenge—revenge against Sims and Ward for robbing Tom and disobeying defendant, or revenge against Little Tony for trying to have defendant killed.

Defendant argues he was prejudiced because a juror who believed defendant and Dorsey may have believed defendant shot Sims in self-defense and convicted him of Ward's murder as an accomplice, and "[t]hus, the double murder finding does not demonstrate the jury certainly would have convicted [defendant] of Sims's murder regardless of the self defense instruction's language regarding motive." But the jury found true the enhancement allegation that he *personally discharged* a firearm causing great bodily injury or death to *both* victims. This means the jury found defendant shot more than once and shot both victims, and it did not believe defendant's testimony

18

that he shot only once and did not shoot at Ward. We "must ultimately look to the *evidence* considered by [the] defendant's jury under the instructions given in assessing the prejudicial impact or harmless nature of the error." (*People v. Harris* (1994) 9 Cal.4th 407, 428.) Here, given the witness testimony (that defendant had an assault rifle, that he ordered the victims out of the van and had them lie on the ground, that he called Sims a "fucking little bitch" before shooting him) and the physical evidence (the number of rifle casings, the nine gunshot wounds on the two victims, including many entrance wounds on the back), and the jury's findings that defendant personally shot both victims, we conclude beyond a reasonable doubt that the result would not have been different had the jury been instructed self-defense required defendant to have "acted under the influence of those fears, and not in a spirit of revenge."

B.    *Fines and Fees Imposed Without a Finding of Ability to Pay*

At sentencing in August 2020, the trial court ordered defendant to pay a restitution fine of $10,000, a theft fine of $10, a court operations fee of $160, and a criminal conviction fee of $120. Defendant did not object or request a determination of ability to pay.

On appeal, defendant argues these fines and fees were erroneously imposed absent evidence he had the ability to pay them. He relies on *People v. Dueñas* (2019) 30 Cal.App.5th 1157, 1164 (*Dueñas*), which held, under the circumstances of the case, that due process required a hearing on the defendant's ability to pay before the trial court could impose certain fees, and/or *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1060 (*Aviles*), which held "a constitutional challenge to the imposition of fines, fees, and assessments should be based on the excessive fines clause of the Eighth Amendment instead of the due process rationale utilized in *Dueñas*."

Defendant was sentenced well after *Dueñas* and *Aviles* came out, but he did not argue to the trial court that he had no ability to pay the fines and fees imposed. Under these circumstances, his appellate claim is forfeited. (See *People v. Trujillo* (2015) 60 Cal.4th 850, 856, 859 [constitutional claim regarding ability to pay fees is subject to the forfeiture rule].)

Anticipating that his claim may have been forfeited, defendant next argues defense counsel's failure to raise the issue of ability to pay at the sentencing hearing deprived him of effective assistance of counsel.

"On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

Here, the record is silent as to why defense counsel did not object to the imposition of fines and fees. Although defendant asserts the "chance [he] will be able to pay the imposed fines during his life term in prison is negligible," the record does not foreclose the possibility that defense counsel had a sound reason for not raising the issue of ability to pay. Consequently, we cannot say defendant received ineffective assistance of counsel on direct appeal.

In sum, defendant forfeited his challenge to the trial court's imposition of fines and fees based on inability to pay, and defendant has not established on direct appeal that defense counsel's failure to raise the issue with the trial court was ineffective assistance of counsel.

C.    *Additional Sentencing Issues*

     1.    <u>Unauthorized Sentence</u>

The trial court sentenced defendant to 25 years to life for count 1 (murder of Sims) plus a consecutive term of 25 years to life for the firearm enhancement (§ 12022.53, subd. (d)); a consecutive term of 25 years to life for count 2 (murder of Ward) plus a consecutive term of 25 years to life for the firearm enhancement; two years for count 3 (possession of firearm by felon) to run concurrent with counts 1 and 2; and two years for count 4 (second degree robbery) also to run concurrent with counts 1 and 2, for an aggregate indeterminate term of 100 years to life in prison. The court then sentenced defendant to life without the possibility of parole for the special circumstance of multiple murders (§ 190.2, subd. (a)(3)).

As we have described, the jury found defendant guilty of two counts of first degree murder and found true the special circumstance that he was convicted of more than one murder within the meaning of section 190.2, subdivision (a)(3).

Section 190.2, subdivision (a), provides in relevant part, "The penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole if one or more of the following special circumstances has been found . . . to be true:" "(3) The defendant, in this proceeding, has been convicted of more than one offense of murder in the first or second degree."

Defendant argues—and the Attorney General concedes—that, because the prosecutor in this case did not seek the death penalty in this case, the only authorized punishment for defendant's first degree murder convictions under section 190.2's multiple-offense special circumstance is a single term of life without the possibility of parole. The parties agree that the imposition of

21

additional terms of 25 years to life for counts 1 and 2 was unauthorized. We accept the Attorney General's concession. Section 190, subdivision (a), specifies that first degree murder is to be punished by one of three options: "[1] death, [2] imprisonment in the state prison for life without the possibility of parole, *or* [3] imprisonment in the state prison for a term of 25 years to life," and "[t]he penalty to be applied *shall be determined as provided in Sections* 190.1, *190.2*, 190.3, 190.4, and 190.5." (Italics added.) In this case, section 190.2 applied and therefore life without the possibility of parole is the penalty; no additional penalty is authorized.

Accordingly, we vacate the sentence and remand for resentencing, where the trial court may reconsider the entire sentence. (See *People v. Buycks* (2018) 5 Cal.5th 857, 893 ["when part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances' "].)

### 2. Miscalculation of Presentence Custody Credits

The parties also agree that the trial court miscalculated defendant's presentence custody credit. Defendant was taken into custody on April 2, 2015, and was sentenced on August 17, 2020. This amounts to 1,965 days in presentence custody, but the trial court credited defendant with only 1,956 days. On remand, the trial court is instructed to recalculate defendant's custody credit.

### DISPOSITION

The sentence is vacated and the matter is remanded to the trial court for a full resentencing in accordance with this opinion. The trial court is instructed to recalculate defendant's presentence custody credit. The judgment is otherwise affirmed.

22

                                     _____

                                     Miller, J.

WE CONCUR:


_____

Stewart, Acting P.J.


_____

Mayfield, J.*


A161139, *People v. Broussard*

---

      \* Judge of the Mendocino Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.